No. 24-60208

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————————

ESTATE OF LA'MELLO PARKER; L.S., A MINOR, BY AND
THROUGH KEVIN SMITH HIS NEXT FRIEND,
INDIVIDUALLY AND ON BEHALF OF
ALL ENTITLED TO RECOVER
*Plaintiff-Appellees*

v.

MISSISSIPPPI DEPARTMENT OF PUBLIC SAFETY; TROY
PETERSON, HARRISON COUNTY SHERIFF, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES; HARRISON COUNTY, MISSISSIPPI;
CHRIS ALLEN, HARRISON COUNTY DEPUTY, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES; HARRY MOSKOWITZ,
HARRISON COUNTY DEPUTY, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITIES; CITY OF GULFPORT, MISSISSIPPI;
MICHAEL MORAN, GULFPORT POLICE OFFICER, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES; JOHN DOE,
MISSISSIPPI HIGHWAY PATROL TROOPERS 1-8, IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITIES; JOHN DOES, 1-75
*Defendant-Appellants.*

———————————————

On Appeal from the United States District Court for the
Southern District of Mississippi, Southern Division
Case No. 1:23-cv-185-TBM-RPM

———————————————

# PRINCIPAL BRIEF OF APPELLANTS

———————————————

**Submitted By:**

J. Matthew Eichelberger, Miss. Bar No. 101060
Madeline M. Iles, Miss. Bar No. 106186
THE EICHELBERGER LAW FIRM
1640 Lelia Drive, Suite 120
Jackson, MS 39216
T: 601.292.7940
F: 601.510.9103
E: matt@ike-law.com
E: madeline@ike-law.com

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. The Honorable Taylor B. McNeel, *District Judge*
2. The Estate of La'Mello Parker, *Plaintiff-Appellee*
3. L.S., a minor who appears by and through his next friend Kevin Smith, *Plaintiff-Appellant*
4. J. Matthew Eichelberger of The Eichelberger Law Firm, *Lead Counsel for the Plaintiff-Appellants*
5. Madeline M. Iles of The Eichelberger Law Firm, *Counsel for the Plaintiff-Appellants*
6. Chris Allen, *Defendant-Appellee*
7. Harry Moskowitz, *Defendant-Appellee*
8. Troy Peterson, *Defendant-Appellee*
9. Mariano Barvie of Hopkins, Barvie & Hopkins, P.L.L.C., *Counsel for Chris Allen, Harry Moskowitz, and Troy Peterson*
10. Alben Hopkins of Barvie & Hopkins, P.L.L.C., *Counsel for Chris Allen, Harry Moskowitz, and Troy Peterson*
11. Harrison County, Mississippi, *Defendant-Appellee*
12. Tim Holleman of Boyce Holleman & Associates, *Counsel for Harrison County*
13. Patrick Guild of Boyce Holleman & Associates, *Counsel for Harrison County*
14. City of Gulfport, Mississippi, *Defendant-Appellee*
15. Jeffrey Bruni of Gulfport City Attorney's Office, *Counsel for the City of Gulfport*
16. Michael Moran, *Defendant-Appellee*
17. William Whitfield of Copeland, Cook, Taylor & Bush, P.A., *Counsel for Michael Moran*

18. Kaara Lind of Copeland, Cook, Taylor & Bush, P.A., *Counsel for Michael Moran*
19. Mississippi Department of Public Safety, *Defendant-Appellee*
20. Claire Barker of the Mississippi Attorney General's Office, *Counsel for the Mississippi Department of Public Safety*

*/s/ Madeline Iles*
Madeline Iles
Attorney for the Plaintiff-Appellants

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.........................................3

TABLE OF CONTENTS ..................................................................5

STATEMENT REGARDING ORAL ARGUMENT ...............................6

TABLE OF AUTHORITIES ............................................................7

JURISDICTIONAL STATEMENT ....................................................9

STATEMENT OF THE ISSUES .....................................................10

STATEMENT OF THE CASE ........................................................10

SUMMARY OF THE ARGUMENT ..................................................20

STANDARD OF REVIEW .............................................................20

ARGUMENT .............................................................................21

   I.   Qualified immunity defenses offend Congress's plain intent and
must be abandoned. ...............................................................21

      A.   *The Text of the Act Passed by Congress*....................................22

      B.   *An Accidental yet Consequential Omission* ..............................24

      C.   *The Supreme Court Recognizes Congress's Original Language
Controls*...............................................................................25

      D.   *Despite the Original Language, the Supreme Court Applied a
Common Law Immunity*..........................................................26

   II.  Trooper Doe 1 forfeited qualified immunity by shooting and killing
3-month-old La'Mello Parker.....................................................28

      A.   *Shooting La'Mello constituted an unreasonable seizure.*...........30

      B.   *Shooting La'Mello violated clearly established law.* ..................35

   III. The Plaintiffs have standing against all eleven officers who fired
at La'Mello. ..........................................................................41

   IV. None of the eleven officers who fired at La'Mello are entitled to
qualified immunity. ................................................................45

      A.   *A Fourth Amendment violation was clearly established.* ..........45

      B.   *A Fourteenth Amendment violation was clearly established.* ...46

CONCLUSION ..........................................................................48

CERTIFICATE OF SERVICE ........................................................49

CERTIFICATE OF COMPLIANCE..................................................50

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, the Plaintiff-Appellants request oral argument in this case. Oral argument would allow for a deeper discussion of the fatally flawed and unsound basis of qualified immunity.  Furthermore, oral argument would allow the parties to further unpack the circumstances of La'Mello Parker's death—specifically the decision by nearly a dozen law enforcement officers to shoot directly at an innocent baby.

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...............................................30

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).......................................30

*Bennett v. Spear*, 520 U.S. 154 (1997).....................................................44

*Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468 (6th Cir. 2022).......................................................................................................45

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) ......................35, 36, 37

*Cooper v. Rutherford*, 503 F. App'x 672 (11th Cir. 2012) ........................39

*Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000)...........31

*Grandstaff v. City of Borger, Texas*......................................41, 42, 43, 47

*Guerra v. Castillo*, 82 F.4th 278 (5th Cir. 2023)...............................20, 21

*Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998) .........29

*Harmon v. City of Arlington, Texas*, 16 F.4th 1159 (5th Cir. 2021).37, 38

*Hope v. Pelzer*, 536 U.S. 730 (2002) .......................................................40

*Id.*................................................................................................................32

*Laviage v. Fite*, 47 F.4th 402 (5th Cir. 2022) .........................................21

*Mendez v. Poitevent*, 823 F.3d 326 (5th Cir. 2016) ................................32

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009) .....................................29

*Romero v. City of Grapevine, Texas*, 888 F.3d 170 (5th Cir. 2018)........31

*Saucier v. Katz*, 533 U.S. 194 (2001) .....................................................29

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) .............................................29

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................30

*Scott v. Harris*, 550 U.S. 372, 381 (2007) ..............................................30

*Summers v. Hinds County*, 508 F. Supp. 3d 124 (S.D. Miss. 2020) .......45

*Tarver v. City of Edna*, 410 F. 3d 745 (5th Cir. 2005) ............................30

*Tarver v. City of Edna*, 410 F. 3d 745, 750 (5th Cir. 2005) ....................30

*Tennessee v. Garner*, 471 U.S. 1 (1985) .................................................31

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...............................................30, 40

## Statutes

28 U.S. C. § 1367.......................................................................................... 9

28 U.S.C. § 1331........................................................................................... 9

28 U.S.C. § 1332........................................................................................... 9

28 U.S.C. §1291............................................................................................ 9

42 U.S.C. § 1983...................................................................................passim

*Green v. Thomas*, No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133 (S.D. Miss. May 20, 2024) ...............................................................28

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496 (1939) ...........................26

*Pierson v. Ray*, 352 F.2d 213 (5th Cir. 1965) .......................................27

*Pierson v. Ray*, 386 U.S. 547 (1967) ....................................................27

## Other Authorities

7 Cong. Rec. 1137 ................................................................................24

Representative Horace Maynard, CONG. GLOBE, 42d Cong., 1st Sess., App. 310 (1871) .................................................................................24

Senator A.G. Thurman, CONG. GLOBE, 42d Cong., 1st Sess., App. 217 (1871) .................................................................................................23

## Rules

Fed. R. App. 32(a)(6) .............................................................................50

Fed. R. App. P. 32(a)(5) .........................................................................50

Fed. R. App. P. 32(f) ..............................................................................50

Rule 25(b) and (c) of the Federal Rules of Appellate Procedure ............49

# JURISDICTIONAL STATEMENT

## I.  Jurisdiction in the District Court

Estate of La'Mello Parker filed suit against the Defendants under 42 U.S.C. § 1983 for a violation of La'Mello Parker's constitutional rights. Accordingly, the United States District Court for the Southern District of Mississippi had jurisdiction pursuant to 28 U.S.C. § 1331. Diversity jurisdiction also existed pursuant 28 U.S.C. § 1332, as the amount in controversy exceeded $75,000, and the Plaintiffs are residents of Louisiana while the Defendants are residents of Mississippi.

The district court also had supplemental jurisdiction over the Plaintiffs' accompanying state law claims pursuant to 28 U. S. C. § 1367. However, because the district court ultimately dismissed the Plaintiffs' federal claims, it did not exercise supplemental jurisdiction over the state law claims and instead remanded those claims to the Circuit Court of Hinds County, Mississippi, First Judicial District.

## II.  Jurisdiction in the Court of Appeals

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 because it is an appeal of a final order of a district court.  On April 25, 2024, the Estate of La'Mello Parker and L.S. timely appealed

the Final Judgment and Memorandum Opinion and Order of the United States District Court for the Southern District of Mississippi entered on March 29, 2024, which dismissed all of the Plaintiffs' federal law claims and remanded the accompanying state law claims to the Circuit Court of Hinds County, Mississippi, First Judicial District.

## STATEMENT OF THE ISSUES

I.  Qualified immunity defenses offend Congress's plain intent and must be abandoned.

II.  Trooper Doe 1 forfeited qualified immunity by shooting and killing 3-month-old La'Mello Parker.

III.  The Plaintiffs have standing against every officer who fired at La'Mello.

IV.  None of the eleven officers who fired at La'Mello are entitled to qualified immunity.

## STATEMENT OF THE CASE

Since 1967, our nation has been down the dark rabbit hole created by the refusal of our courts to hold law enforcement officers accountable when they violate the civil rights of Americans. In May of 2021—sixty years after the Freedom Rides that ultimately led our Supreme Court to birth the law enforcement immunity doctrine now known as qualified

immunity—we found the bottom of that hole in the form of a dead infant, killed by those we as citizens trust most to protect us.

3-month-old La'Mello Parker was shot and killed by a member of the Mississippi Highway Patrol. The circumstances that led to this tragedy are described below and in greater detail in the Amended Complaint. But the most important fact of this case—a fact overlooked by the district court—is that this was no accident. Trooper Doe 1 and the other ten law enforcement officers who fired their weapons *knew* they were shooting directly at an innocent baby. And they did so in an effort to protect another law enforcement officer who endangered himself and recklessly escalated a dangerous situation, not to protect the public at large. For that, they must be held accountable.

## *Facts*

On the morning of May 3, 2021, 3-month-old La'Mello Parker was kidnapped from his home in Baker, Louisiana by his father, Eric Smith. Investigation by the local sheriff's department revealed Smith had likely shot and killed La'Mello's mother and cousin before escaping with the baby. Louisiana authorities obtained a warrant for Smith's arrest, tracked his location via cell tower, and eventually caught up with him

that afternoon traveling east toward Mississippi on Interstate 10. ROA.19-20.

Once Smith reached the state line, law enforcement officers from the Mississippi Department of Public Safety's Mississippi Highway Patrol (MHP) and the Hancock County Sheriff's Office began following Smith. ROA.20. Near mile marker 11, a Hancock County deputy deployed spike strips on I-10 in an effort to stop Smith's vehicle. The spike strips punctured multiple tires, and Smith slowed his vehicle to a near stop. *Id.*

Smith then exited the vehicle—with La'Mello in his arms. While holding La'Mello to his chest, Smith pointed a handgun at one of the MHP troopers and fired one round. *Id.* Not one single officer returned fire. Smith then got back into his car, still holding La'Mello, and continued driving east at a slow rate of speed. *Id.*

A couple of miles down the road, a Regional Task Force—comprised of MBI, MDOC, US Marshals Service, Harrison County Sheriff's Department, and Biloxi Police Department—joined the pursuit on I-10. ROA.20-21. Significantly, all the members of this task force

were told not only about Smith's shooting at an officer near mile marker 11, but also that baby La'Mello was in the car. ROA.21.

Around mile marker 20, a Homeland Security Investigations helicopter began following Smith's car. *Id.* Using a Forward Looking InfraRed (FLIR) camera system, an agent in the helicopter was able to give detailed information about what was happening inside Smith's vehicle. Specifically, the agent, who was communicating with the other law enforcement agencies via radio, was able to tell other officers that Smith had a handgun in his right hand and that he was holding La'Mello against his chest with his right arm. *Id.*

During the next several miles of the pursuit, there were repeated communications between officers that Smith was holding La'Mello against his chest. ROA.21-22. In addition to this being verified by the Homeland Security agent, multiple officers at the front of the pursuit communicated that they could see Smith holding a gun in one hand and La'Mello in the other. *Id.*

Meanwhile, the Regional Task Force coordinated with Biloxi Police Department, who began to assemble and deploy their Special Response Team, which was made up of sniper, tactical-entry, and

hostage-negotiation teams. ROA.21. MHP was able to force Smith's car over another set of spike strips, which punctured the remaining tires. Smith continued, but at a much slower speed.

By the time Smith's car reached mile marker 35, Harrison County Sheriff's Department was actively involved in the pursuit, and their dispatch relayed to its officers that Smith was holding La'Mello against his chest. ROA.21-22. Importantly, Biloxi Police had established a roadblock up ahead at mile marker 44, complete with snipers and hostage negotiators. *Id.* Unfortunately, due to the law enforcement agencies' complete lack of communication and failure to intervene, La'Mello would never reach this point. *Id.*

As Smith's car approached mile marker 41, Harrison County officers took matters into their own hands. ROA.22-23. Harrison County Sheriff Troy Peterson ordered deputies to bring an end to the pursuit by pushing Smith's car off the interstate. This was ordered with knowledge that La'Mello was in the car, and despite the fact that Biloxi's Special Response Team had established a roadblock with hostage negotiators and snipers present mere moments ahead. ROA.22-24.

At this point, MHP vehicles led the convoy, blocking the entirety of the eastbound lanes of I-10 just behind Smith. At the order of the Sheriff, Harrison County K9 Deputy Chris Allen drove around the MHP vehicles and rammed Smith's vehicle from behind. *Id.* This PIT maneuver forced Smith's vehicle into the median, which was muddy from recent rain. Westbound traffic on I-10 had been stopped, creating a parking lot full of innocent citizens on these two lanes on the other side of the median. ROA.23-25. Smith's car spun nearly 180 degrees and was facing west, inoperable. *Id.* Deputy Allen's car was side-by-side with Smith's, with their driver's side doors nearly touching. ROA.22-23. Deputy Allen then drove his car forward approximately 15 feet before it became stuck again. ROA.23.

Deputy Allen got out of his car and walked toward the other officers who had stopped their vehicles and taken positions of cover. *Id.* However, mere feet from Smith's driver's door, exposed to the suspect's line of fire and no longer seeking cover, Deputy Allen drew his weapon and pointed it at Smith, who was holding La'Mello in plain sight. *Id.* Defendant Allen was not alone, as at least a dozen other officers also pointed their weapon at Smith, when they all knew and could see that

Smith was holding La'Mello. *Id.* Behind Smith—and in the line of fire of the law enforcement officers—were the innocent citizens trapped in their cars on the other side of the interstate. Notably, at no point did these officers claim that Smith was pointing a weapon at them when they drew theirs on him and La'Mello. *Id.*

A few seconds later, Defendant Allen noticed that the police dog had escaped from his vehicle. *Id.* The dog ran along the opposite side of Smith's vehicle, and then continued to run away from Smith's vehicle towards the front of a parked law enforcement vehicle. Defendant Allen then lowered his weapon and tried to corral the dog, who had run along the opposite side of Smith's vehicle and was headed toward another law enforcement vehicle. *Id.*

While Defendant Allen was chasing his dog, Smith lowered the window to his car and fired a shot. ROA.23-24. This shot was in the direction of Allen and away from the citizens. *Id.* Unlike the first time that Smith fired at officers some 20 miles west, this time nearly a dozen officers opened fire on the vehicle, mortally wounding La'Mello. Each and every law enforcement officer who fired his weapon *knew* La'Mello

was innocent, helpless, and *directly in the line of their fire. Id.* Further, the drivers on the other side of I-10 were as well.

It was no secret that baby La'Mello was in that car. In fact, the law enforcement agencies pursuing Smith were not the only ones who had been given this information. ROA.23-24. It was public knowledge and had been shared on local news outlets. One man who was stuck in the standstill traffic on the other side of I-10 began videoing the incident with his cell phone. *Id.* In this video, the passenger in the man's car can be heard yelling, "They need to be careful! There's a baby in there!" ROA.24.

The fact that La'Mello was one with the target, Eric Smith, did not stop eleven law enforcement officers—all of whom were safely behind cover—from drawing their weapons, aiming straight at him, and firing. Video shows the officers *unloading* on Smith's car, leaving it completely riddled with bullets.

The law enforcement officers who fired weapons at the car La'Mello was in are: Harrison County Deputy Harry Moskowitz, Gulfport Police Officer Michael Moran, MDOC/US Marshall Task Force Officer Sam Tucker, and eight unidentified MHP troopers (referred to

by the Plaintiffs as John Doe Troopers 1-8). ROA.24. At the conclusion of the investigation into this officer-involved shooting, ballistics testing revealed that Trooper Doe 1 fired the shot that killed La'Mello. *Id.* Despite requests from Plaintiffs' counsel, the identity of this trooper has remained hidden by law enforcement to this point.

### *Procedural History*

On November 1, 2022, the Estate of La'Mello Parker and L.S., La'Mello's half-brother and a minor appearing by and through his next friend Kevin Smith ("Plaintiffs"), filed suit in the Circuit Court of Hinds County, Mississippi against the following Defendants: Mississippi Department of Public Safety; Harrison County, Mississippi; Harrison County Sheriff Troy Peterson; Harrison County Deputy Chris Allen; Harrison County Deputy Harry Moskowitz; City of Gulfport, Mississippi; Gulfport Police Officer Michael Moran, John Doe Mississippi Highway Patrol Troopers 1-8, and John Does 1-75. ROA 75-91. An Amended Complaint was filed on April 25, 2023. ROA.16-43. The Plaintiffs brought claims pursuant to 42 U.S.C. § 1983 for violations of La'Mello's constitutional rights under the Fourth and Fourteenth Amendments, as well as state law claims under the

Mississippi Tort Claims Act for reckless endangerment, failure to train and failure to intervene.

On May 24, 2023, the case was removed to the United States District Court for the Southern District of Mississippi. ROA.12-15. The Mississippi Department of Public Safety subsequently filed a Motion for Judgment on the Pleadings under FRCP 12(c). ROA.376-397. Defendant Officer Moran filed a 12(b)(6) Motion to Dismiss, which was later joined by Defendants Allen, Moskowitz, and Peterson, as well as Harrison County and the City of Gulfport. ROA.398-423, 427-435, 499-505.

A motion hearing was held before the Honorable Taylor B. McNeel on March 18, 2024. Following the hearing, the Court issued an order dismissing all of the Plaintiffs' federal claims, finding no violation of La'Mello's constitutional rights, and that the officers would be protected by the doctrine of qualified immunity. ROA 519-548. With no remaining federal claims, the Court remanded the state law claims to Hinds County Circuit Court. The Plaintiffs timely appealed the District Court's decision to this Court. ROA.551-552.

## SUMMARY OF THE ARGUMENT

Contrary to assertions by the trial court and defendants, La'Mello Parker was not simply struck by an errant bullet. Eleven officers aimed their guns directly at him and fired. This egregious act by law enforcement violated La'Mello's constitutional rights under the Fourth and Fourteenth Amendments. The district court's dismissal of the Plaintiffs' claims was based on an incomplete view of the facts and a misapplication of precedent. Therefore, the judgment must be reversed.

Further, as a result of the plain language of the Civil Rights Act of 1871 as passed by Congress, the doctrine of qualified immunity—based as it is on State custom—is barred and may not be relied upon by any Defendant. However, recognizing this Court may find itself bound to follow Supreme Court precedent regarding qualified immunity, the Plaintiff-Appellants also set forth the ways in which the officers' conduct in this case violated clearly established law from the Fifth Circuit and why they therefore are not entitled to qualified immunity.

## STANDARD OF REVIEW

This Court reviews a Rule 12(b)(6) motion to dismiss de novo. *Guerra v. Castillo*, 82 F.4th 278, 284 (5th Cir. 2023). "To survive a

motion to dismiss, a plaintiff must plead enough facts to state a claim to relief that is plausible on its face," and the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* In its review, the Court "must accept all facts as pleaded and construe them in the light most favorable to the plaintiff." *Id.*

Likewise, a "12(c) motion for judgment on the pleadings is also reviewed de novo, and the 12(c) standard is the same as that applied to Rule 12(b)(6). *Id.* (internal quotation marks omitted). "To survive a Rule 12(c) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 284-285 (quoting *Laviage v. Fite*, 47 F.4th 402, 405 (5th Cir. 2022).

## ARGUMENT

### I. Qualified immunity defenses offend Congress's plain intent and must be abandoned.

The Plaintiff-Appellants recognize that today, United States Supreme Court precedent dictates that this Honorable Court apply the doctrine of qualified immunity to the instant case. However, that doctrine exists in direct conflict with the express text of the Civil Rights Act of 1871 and the plain, inarguable intent of Congress in passing

what is now 42 U.S.C. § 1983. For that reason—and for the protection of the God-given rights of our fellow American citizens—we are duty-bound to urge the revocation of the doctrine of qualified immunity.

## A. The Text of the Act Passed by Congress

As our nation recovered from its Civil War in the late 1860s, Congress sought to prevent the deprivation of civil rights by local governments and those acting under color of law. In 1871, Congress passed Representative Samuel Shellabarger's HR 320, which at the time was known as the Ku Klux Klan Act or the Third Enforcement Act ("the Act"). HR 320 contained several provisions, but its first provision is what became 42 U.S.C. Section 1983:

> Any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress….

The text above—including the portion in bold italics, which came to be known as the Notwithstanding Clause—was passed by Congress and signed into law by President Grant. [1]

That text itself was explicitly referenced during the lengthy Congressional debates on HR 320, and we know exactly what those words meant to Congress in that time. When speaking of the words "custom or usage," Senator A.G. Thurman said:

> Have the Senators noticed how comprehensive its language is? It refers to deprivation under color of law, either statute law or 'custom or usage' which has become common law.

Senator A.G. Thurman, CONG. GLOBE, 42d Cong., 1st Sess., App. 217 (1871). It is without serious doubt that HR 320, passed by Congress in April of 1871 and signed into law by President Grant, barred common law defenses to these civil suits. And though there was considerable discussion of the legislation, there was little concerning its first section and the Notwithstanding Clause in it. After reading the first section to the House of Representatives, Rep. Horace Maynard queried 'Pray, tell me who objects to that?" and went on to describe how the Act simply

---

[1] *See* ROA.36-43 – a copy of the Civil Rights Act of 1871 certified by the National Archives and Record Administration.

held anyone accountable who violated the rights of another under color of law. Representative Horace Maynard, CONG. GLOBE, 42d Cong., 1st Sess., App. 310 (1871).

Yet here we are, 150 years later, mired in qualified immunity, a common law defense.

## B. An Accidental yet Consequential Omission

Just a few years after the passage of the Civil Rights Act of 1871, the Notwithstanding Clause was omitted when the first Revised Statutes were compiled. Not because Congress voted to remove it, but because of what appears to be a clerical error by one man, Thomas Jefferson Durant, who compiled the Revised Statutes of 1874. Simply put, the Revised Statutes of 1874 were a mess. Senator Christiancy of Michigan was chair of the Committee on the Revision of Laws that year, and said on the Senate floor (7 Cong. Rec. 1137):

> The Revised Statutes, the present edition, on their adoption repealed all the laws which were re-enacted in them, and it was found that there were a great many errors in the revision adopted, which altered the law contrary to the intention of Congress in the passage of them.

One of those many errors in the Revised Statutes of 1874 was in section 1 of HR 320, in which Durant simply omitted the Notwithstanding

Clause. The second Revised Statutes, known as the Revised Statutes of 1878, did not attempt to fix the errors in the Revised Statutes of 1874. Congress instead noted their mistake in adopting the Revised Statutes of 1874 and made sure the mistake would not be made again in the future by making clear that the Revised Statutes *are only evidence of what the law is*. To find the actual law, you must look at what Congress passed.

Over time, Congress has adopted several titles of the U.S. Code as "positive law," meaning that the text as it is found in that title is not prima facie evidence of what the law is; it is the law itself. However, Title 42 of the United States Code has not been adopted by Congress as positive law.

## C. The Supreme Court Recognizes Congress's Original Language Controls

As late as 1939, the United States Supreme Court was looking to the text of the Act and admitting that while Congress omitted the Notwithstanding Clause in the Revised Statutes, there was no intent to change what Congress meant by the Act. Justice Owen Roberts

included the Notwithstanding Clause in his recitation of what we now

have as 42 U.S.C. § 1983 when he wrote:

> A third Civil Rights Act, adopted April 20, 1871,
> provided 'That any person who, under color of any
> law, statute, ordinance, regulation, custom, or
> usage of any State, shall subject, or cause to be
> subjected, any person within the jurisdiction of the
> United States to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution of the United States, shall, any such
> law, statute, ordinance, regulation, custom, or
> usage of the State to the contrary
> notwithstanding, be liable to the party injured in
> any action at law, suit in equity, or other proper
> proceeding for redress. * * *' *This with changes of
> the arrangement of clauses which were not
> intended to alter the scope of the provision became
> R.S. s 1979*, now Title 8, s 43 of the United States
> Code, 8 U.S.C.A. s 43.

*Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 510 (1939) (emphasis

added).

## D. Despite the Original Language, the Supreme Court Applied a Common Law Immunity

As shown above, the original language was known to the Supreme

Court, as was the lack of any intent to alter its purpose during the

compilation of the first Revised Statutes. These facts were also known

to this Honorable Court, which ruled in 1965 that Mississippi's common

law "good faith" immunity was not a defense to cases brought under the Act. *Pierson v. Ray*, 352 F.2d 213, 218 (5th Cir. 1965), aff'd in part, rev'd in part, 386 U.S. 547 (1967).

Despite this, Chief Justice Warren took Mississippi's common-law "good faith" immunity and made it the law of the land when it comes to civil rights:

> We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under Section 1983.

*Pierson v. Ray*, 386 U.S. 547, 557 (1967). It is this "good faith" immunity that became the basis for the doctrine of qualified immunity which has bedeviled our justice system for nearly 60 years. Not only is it this immunity concept without foundation in the text of the Act; it is *counter*-textual and must be abandoned.

We hold steadfast to our assertion that the officers' conduct in this case violated clearly established law from the Fifth Circuit and that they are not entitled to qualified immunity. However, even if this Court finds otherwise, the officers' case still must fail. As set forth above and as written by Judge Carlton Reeves, "For qualified immunity has no basis in law. It is an extra-constitutional affront to other cherished

values of our democracy." *Green v. Thomas*, No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133, at *1 (S.D. Miss. May 20, 2024).

Perhaps the most disturbing truth of this case is that law enforcement needlessly shot and killed an innocent baby, and qualified immunity—a judicially-created doctrine that Congress clearly forbade—might allow those officers to escape accountability.

## II. Trooper Doe 1 forfeited qualified immunity by shooting and killing 3-month-old La'Mello Parker.

Trooper Doe 1 aimed his gun directly at La'Mello Parker and fired the shot that killed him. Yet the trial court found no constitutional violation. Specifically, the trial court determined that the fatal seizure of La'Mello was not unreasonable under the Fourth Amendment, and that even if it were unreasonable, the violation was not "clearly established" to put the officers on notice for purposes of qualified immunity.[2] This decision runs contrary to Fifth Circuit and Supreme Court precedent and must be reversed. Indeed, shooting La'Mello

---

[2] The identity of Trooper Doe 1 has not yet been disclosed to the Plaintiffs, so he or she has not been named as a party to the lawsuit. At the motion hearing, counsel for DPS stated that when named, DPS would assert qualified immunity on behalf of Trooper Doe 1. (Transcript p.14). The trial court in its order ruled that none of the officers, including Trooper Doe 1, violated La'Mello's constitutional rights, and that all of them would be entitled to qualified immunity.

constituted an unreasonable seizure under the Fourth Amendment, and Trooper Doe 1's conduct violated clearly established law from this Court. Therefore, he cannot hide behind the shield of qualified immunity.

In developing the defense of qualified immunity, the United States Supreme Court set forth a two-pronged test of applicability. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, a court is to decide whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and second, "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). These prongs may be approached in whichever order a court sees fit. *Pearson*, 555 U.S. at 236.

The second prong of the qualified immunity analysis involves "two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident;* and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998) (emphasis in original).

A right is clearly established if the law is "sufficiently clear that a reasonable official would understand that what he is doing violates the law." *Tarver v. City of Edna*, 410 F. 3d 745, 750 (5th Cir. 2005). "Although this does not mean that 'a case directly on point' is required, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

A. **Shooting La'Mello constituted an unreasonable seizure.**

La'Mello Parker, along with every other citizen of our country, is protected by the Fourth Amendment to the Constitution's prohibition against unreasonable seizures. That right is implicated when a person suffers from the excessive use of force during an encounter with law enforcement, as is the case here. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). And sadly, La'Mello suffered the ultimate harm: he was killed by officers' unnecessary use of deadly force.

"[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007). To state a claim for excessive force, a plaintiff must allege "(1) an injury (2) which resulted directly and only from the use of force that was clearly

excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). "The use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Romero v. City of Grapevine, Texas*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Garner*, 471 U.S. at 11).

It is undisputed that Trooper Doe 1 intentionally fired his rifle, and a bullet from his gun struck and killed La'Mello. This, as acknowledged by the trial court, constitutes a seizure under the Fourth Amendment. ROA.534. The question then becomes whether that seizure was reasonable.

The Supreme Court made clear decades ago that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "To determine the constitutionality of a seizure '[the Court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify

the intrusion.'" *Id.* at 8. The Court has emphasized, "The intrusiveness of a seizure by means of deadly force is unmatched," and a person's "fundamental interest in his own life need not be elaborated upon." *Id.* at 9.

The Supreme Court instructs courts to consider the totality of the circumstances in a Fourth Amendment reasonableness analysis. Likewise, this Court has emphasized that it "must consider all of the circumstances leading up to that moment, because they inform the reasonableness of [an officer's] decisionmaking." *Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016).

That afternoon on the median of Interstate 10, Eric Smith's car had been forced to a stop and rendered inoperable. ROA.22. The dozens of law enforcement officers who had been chasing him parked and set up behind cover. ROA.22-23. Many of them drew their weapons and pointed them at Smith, who was holding La'Mello. Every single one of them knew that Smith was holding La'Mello against his chest. After all, they had been hearing this fact repeated over the radio communications for over 20 miles and could see it with their own eyes. ROA.20-24.

The only person arguably in danger at the time was Deputy Allen, who, at first had moved toward cover, but then decided to turn back and place himself in Eric's line of fire to chase his dog. ROA.23. While Deputy Allen was chasing his dog, Smith lowered his car window and fired a shot. Unlike the first time Smith fired at officers some 20 miles west, this time eleven officers, including Trooper Doe 1, opened fire on the vehicle, mortally wounding La'Mello. Each and every law enforcement officer who fired his weapon knew La'Mello was innocent, helpless, and directly in the line of their fire.

As Plaintiffs' counsel pointed out at the motion hearing, "The prevailing law enforcement training view in this country is that if there is a chance you will injure an innocent person, you take cover and hold your fire." ROA.623. Officers are trained to take cover and wait. ROA.630. But Trooper Doe 1 and the other 10 officers did not do that. Instead, they chose to fire directly at the innocent baby. That conduct is far from reasonable.

The trial court's reasonableness analysis was flawed because it left out key facts alleged by the Plaintiffs and focused only on the danger Eric Smith posed. For instance, in its dismissal order, the trial

court described the Plaintiffs' argument as an assertion that the officers "used excessive force by shooting in the direction of La'Mello and the car in which he was in…" ROA.533. This misses the most critical aspect of the Plaintiffs' claim. That is, that the officers weren't merely shooting in La'Mello's direction; rather, La'Mello was *one with the target*. By shooting at Eric, the officers were necessarily shooting at La'Mello. Also missing from the trial court's reasonableness analysis was the fact that Trooper Doe 1 was behind cover when he shot, and that Deputy Allen, who had placed himself in Eric's line of fire, was the only person in danger at the time. By ignoring these crucial facts, the district court defied its mandate to view the facts in the light most favorable to the Plaintiffs.

The trial court relied on its "judicial experience and common sense" to determine that "no reasonable jury could find that [the officers'] use of force in firing their service weapons to defend against and subdue Smith, a murderer who had just fired first at law enforcement, was objectively unreasonable." ROA.535. Critically, this analysis overlooks the presence of La'Mello and the effect this would have on a jury. After all, La'Mello was not just in close proximity to Smith. Smith was

clutching La'Mello to his chest, and every officer there, including Trooper Doe 1, knew that.

The Plaintiff-Appellants do not deny that Eric Smith was a dangerous man. ROA.646. But Eric Smith is not the subject of this lawsuit. For even if it was reasonable to shoot Eric because he was firing at an officer, where does La'Mello fit in that analysis? The trial court viewed him as necessary collateral damage. Given his positioning, it was a virtual certainty that he would be hit. La'Mello was a 3-month-old baby—as innocent and pure as a human life can be— and Trooper Doe 1 aimed his rifle directly at him and pulled the trigger. The question of whether that act was reasonable should be left to a jury, not the trial court at the pleading stage.

## B. Shooting La'Mello violated clearly established law.

Precedent from this Court places the constitutionality of Trooper Doe 1's conduct beyond debate. Nearly 40 years ago, the Fifth Circuit considered a case eerily similar to this one. *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986). The events took place on the Mississippi Gulf Coast in Jackson County. One night, sheriff's deputies were searching for a man named Billy Coon, who was believed to have been involved in

a bar shooting and a hit and run. *Id.* at 1159. Deputies eventually located Coon on his own property. *Id.* Coon armed himself with a shotgun, fired at least two shots—shots which Coon claimed were warning shots, but the officers claimed were aimed in their general direction—and went inside his trailer home. *Id.* at 1159-1160. Coon's wife waited outside with the officers and tried to convince him to cooperate. *Id.* However, the standoff continued, and a deputy fired into the trailer. Coon was injured but survived.

Coon's wife Dana, who witnessed the shooting from outside, and his daughter Racheal, "who was in the trailer during the shootout and was four years old at the time, experienced sleeplessness and nightmares afterward." *Id.* at 1160. Dana and Racheal both brought suit, alleging, among other causes of action, a constitutional, excessive-force violation under 42 U.S.C. § 1983.

In considering the viability of their constitutional claims, the Fifth Circuit stated, "Dana and Racheal Coon, like all persons who claim a deprivation of constitutional rights, were required to prove some violation of their personal rights. *Id.* at 1160. The Court provided the following analysis:

…[W]e are persuaded that Racheal made the proof of personal loss required for a constitutional claim, but that Dana did not. There was no evidence that any act of the deputies was directed toward Dana; she was not directly involved in the shooting and was with the deputies when it occurred. Racheal, however, was in the trailer. There was evidence that Coon staggered into his trailer and while he was there attempted to protect Racheal from the gunfire, and there was evidence that deputy Gussberry fired a round of heavy buckshot into the trailer at that time.

*Id.* at 1160-61.

We have a nearly identical situation here. Law enforcement pursues a father suspected of a crime. The father, contained inside an enclosed space with his child, is not cooperating with—and has even fired a gun at—law enforcement. Despite the presence of innocent bystanders, officers return fire. Notably, the Court in *Coon* stated that "the jury could have concluded that the deputies knew or should have known that other persons besides Billy Dan Coon were in the trailer, so that the requisite level of reckless conduct. . . was met." *Id.* As alleged in the Amended Complaint, the officers here *knew* not only that La'Mello was inside that car, but that he was being held against Eric's chest, when they opened fire directly at them.

The Fifth Circuit discussed *Coon* in a more recent case, *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1168 (5th Cir. 2021). There, an

officer reached through a car window to shoot a suspect at close range. The passenger brought an excessive force claim based on a bystander theory since the officer had fired the gun "mere inches away from the face of [the plaintiff]—and fired." *Id.* In considering whether the passenger had a valid claim, the Fifth Circuit explained that "[b]ystander excessive force claims can only succeed when the officer directs the force toward the bystander—that is to say, when the bystander is not really a bystander." *Id.* After recounting the Coon facts, the Court ruled that Harmon's bystander theory failed because, "Like Coon's wife, he was not within the purview [of the officer's] gunfire." *Id.*

Here, like Coon's daughter Racheal, baby La'Mello was undoubtedly "within the purview" of the officers' gunfire. In fact, he more than just "within the purview." He was one with the target. Plaintiffs' counsel repeatedly stated in the Amended Complaint and in the motion hearing that every officer who fired, including Trooper Doe 1, knew not only that La'Mello was in the car, but also that Eric was holding La'Mello against his chest. ROA.20-25,619. Yet they shot directly at them anyway. The precedent outlined above clearly

established that this conduct constituted excessive force and was objectively unreasonable.

The trial court found that "La'Mello's presence at the scene due to Smith's violent and irate actions—while heartbreaking—does not change the outcome based on the law," and cited an 11th Circuit case, *Cooper v. Rutherford*, 503 F. App'x 672 (11th Cir. 2012). ROA.537. It is important to note that La'Mello was not merely *present* at the scene. He was one with the target. That was not the case in *Cooper*. There, an armed bank robber attempted to flee the scene by forcing his way into a nearby vehicle driven by a mother and her two children. When officers fired at the suspect, he was in the driver's seat with the driver's door open. The mother was in the passenger seat, and the children were in the back seat. This is much different from the present case, where the suspect Smith was holding La'Mello against his chest.

Likewise, none of the other cases cited by the trial court involved a situation where the victim was one with the target. In the other similar cases referenced by the trial court, the officers were aiming for a suspect and accidentally shot another person. ROA.535-538. But here, Trooper Doe 1 and the other ten officers did intentionally fire directly at

La'Mello.  By firing at Smith, it was virtually impossible not to shoot La'Mello.  So, Trooper Doe 1 either intentionally killed a baby, or he completely disregarded the baby's life. We can all agree that he did not intend for La'Mello to die.  But you cannot escape the fact that shooting at Smith was the same as shooting at La'Mello.  They were not just in close proximity; they were one and the same.

According to the Supreme Court, "'[T]he salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Here, the answer is undoubtedly yes.  *Coon* put law enforcement officers on notice that they cannot fire indiscriminately into an enclosed space when they have reason to believe there are innocent people inside.  Trooper Doe 1 had actual knowledge that by aiming and firing his rifle at the suspect Eric Smith in his car, he was necessarily aiming and firing at La'Mello Parker, an innocent 3-month-old baby.  That behavior—shooting through an innocent human shield—is not even acceptable on a battlefield in a war, and it certainly should not be acceptable under our

country's Constitution. (*See* Article 58, Protocol I, Geneva Conventions).

Because the violation is clearly established under Fifth Circuit

precedent, Trooper Doe 1 is not entitled to qualified immunity.

## III. The Plaintiffs have standing against all eleven officers who fired at La'Mello.

Although Trooper Doe 1 fired the fatal shot, he did not act alone. His

shots were accompanied by a barrage of gunfire from ten other law

enforcement officers, including Harrison County Deputy Harry

Moskowitz, Gulfport Police Officer Michael Moran, MDOC/U.S. Marshal

Task Force Officer Sam Tucker, and seven other Mississippi Highway

Patrolmen. Every single one of them exhibited the same complete,

conscious disregard for La'Mello's life and must be held accountable.

The trial court determined the Plaintiffs lacked standing to sue the

officers whose bullets did not strike La'Mello, due to an inability to

meet the causation requirement. However, under precedent from this

Court, every officer who fired may be held liable because their conduct

encouraged others to do the same.

In *Grandstaff v. City of Borger, Texas*, the Fifth Circuit considered

a case in which multiple officers mistakenly shot an innocent man. 767

F.2d 161 (5th Cir. 1985).  City of Borger police were in pursuit of a fugitive named Lonnie Cox.  Just after 4:00 in the morning, several police units followed Cox onto the 6666 Ranch.  After being wounded, Cox stopped his pickup truck and fled on foot.  The commotion awakened foreman James Grandstaff and his family, who lived in a house a couple hundred yards away.  Grandstaff left his house to investigate the situation and learned that law enforcement was searching for a potentially dangerous suspect.  He returned home to warn his family, then went back to assist the officers.  At that point, "there were five police cars in a line on the caliche road manned by six Borger policemen, composing the entire night shift of the force. All of the officers were heavily armed." *Grandstaff*, 767 F.2d 161 at 165.  As Grandstaff approached in his pickup truck, four officers "opened fire upon him from two sides," killing him.  *Id.*

Grandstaff's estate and family sued the four officers and the City under 42 U.S.C. § 1983.  The jury returned a verdict in favor of the plaintiffs.  *Grandstaff*, 767 F.2d 161 at 165–66.  On appeal, the officers argued in part that "without evidence and a finding that a particular defendant fired the shot that actually struck and killed Grandstaff,

there can be no constitutional deprivation laid at the feet of any officer."

*Grandstaff*, 767 F.2d at 168. The Fifth Circuit emphatically disagreed, stating:

> The firestorm that killed James Grandstaff was in all respects a joint operation: the same recklessness, the same circumstances, and the same object. Each participant was as much at fault as the others, and all are liable for the foreseeable consequences. Each officer who fired his gun encouraged others to do the same.

*Id.* Under *Grandstaff*, every law enforcement officer who fired shots at Eric Smith's vehicle is liable for the foreseeable harm La'Mello suffered.

Just like the Borger police on the 6666 Ranch, the group of officers on the side of I-10 were set up behind the cover of their vehicles, all aimed at the same target. While Trooper Doe 1's bullet is the one that struck La'Mello, all eleven officers fired their weapons under the same circumstances, exhibiting a complete and total disregard for La'Mello Parker's life. As in *Grandstaff*, every officer who shot encouraged the others to do the same.

This "joint operation" and the influence each officer's conduct had on the others is relevant to the standing analysis and must not be overlooked. In discussing the causal connection required for standing, the Supreme Court has explained, "While. . . it does not suffice if the

injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (cleaned up). Here, we do not know which law enforcement officer discharged his weapon first. (Transcript 64). Indeed, any or all of the other ten officers may have fired before Trooper Doe 1 did. It is entirely possible that their shots spurred Trooper Doe 1 to pull the trigger on his rifle. This assertion must be taken as true at this stage and is sufficient to establish a causal connection between the conduct of those ten officers and the death of La'Mello Parker.

The trial court's logic runs contrary to this Court's reasoning in *Grandstaff*. The trial court honed in on the fact that it was not known which officer's bullet killed James Grandstaff. ROA.529. But this singular fact does not negate the rest of the Court's reasoning, which is highly applicable to the present case. The *Grandstaff* Court could have found that because the identity of the killer was unknown, no officer could be found liable. But it did not. Instead, it emphasized the reckless conduct of every officer who fired, comparing their actions to

that of a firing squad. The Court described it as "pour[ing] their gunfire at the truck and into the person of James Grandstaff," which is exactly what happened to La'Mello Parker. *Grandstaff*, 767 F. 2d at 168. Because this was a "joint operation," the Plaintiffs have standing against every officer who fired at La'Mello.

## IV. None of the eleven officers who fired at La'Mello are entitled to qualified immunity.

The trial court found that even if the Plaintiffs had standing against the other officers who fired at La'Mello, the claims against those officers should be dismissed based on the same reasoning applied to Trooper Doe 1—that no constitutional violation occurred and that the officers were protected by qualified immunity.

### A. A Fourth Amendment violation was clearly established.

The act of firing at La'Mello—even without striking him—constitutes a Fourth Amendment seizure. As the trial court acknowledged, "just being shot at, under the right facts, can be enough to raise claims under the Fourth Amendment." ROA.534. *See Summers v. Hinds County*, 508 F. Supp. 3d 124, 132 (S.D. Miss. 2020); *see also Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 478 (6th Cir. 2022) (holding that

"when an officer seizes one person by shooting at a car, … the officer seizes everyone in the car, even if the officer is unaware of the presence of passengers.")

The other ten officers who fired at La'Mello—namely, Harrison County Deputy Harry Moskowitz, Gulfport Police Officer Michael Moran, MDOC/U.S. Marshal Task Force Officer Sam Tucker, and seven state troopers—acted exactly as Trooper Doe 1 did. For the reasons set forth in Section II, Subsection A, their conduct constitutes an unreasonable seizure under the Fourth Amendment. And as discussed in Section II, Subsection B, the *Coon* case from this Court clearly established this constitutional violation. Therefore, like Trooper Doe 1, these officers are not entitled to qualified immunity.

## B. A Fourteenth Amendment violation was clearly established.

Alternatively, if this Court determines these officers did not "seize" La'Mello because their bullets did not strike him, the Plaintiffs have a claim against those officers under the Fourteenth Amendment. Even if they did not seize him, their conduct shocks the conscience and violated La'Mello's substantive due process rights.

In *Grandstaff*, the Fifth Circuit upheld the finding of liability under § 1983, stating "the Fourteenth Amendment protection against deprivation of life without due process of law is violated when police officers using deadly force, in *conscious disregard* of substantial risk of harm to innocent parties, kill an innocent third party." Grandstaff, 767 F.2d at 167. Here, just as in *Grandstaff*, the officers "showed no inclination to avoid inflicting unnecessary harm upon innocent people. They simply saw a target and fired." *Id.* at 168.

Notably, the officers' conduct in the present case was even more extreme than that of the officers in *Grandstaff*. There, the City of Borger police mistakenly shot Grandstaff thinking it was Cox. The Court noted the officers were merely "aware of the *possibility* that an innocent resident of the house *could have been* in the pickup." *Id.* at 167 (emphasis added). This was found to be a conscious disregard of a substantial risk of harm to innocent parties. Here, all eleven officers unloaded on the car *knowing La'Mello was being held against Eric Smith's chest*. They may have been intending to shoot Eric, but they had *actual knowledge* they were shooting directly at La'Mello too. In order to constitute a Fourteenth Amendment violation, the officer's

conduct must "shock the conscience." It is difficult to imagine a scene more shocking to the conscience than nearly a dozen law enforcement officers, from behind the cover of their vehicles, shooting directly at an innocent baby.

## CONCLUSION

For the reasons set forth above, we respectfully ask this Court to reverse the judgment of the district court and remand the case so that the Plaintiff-Appellants may move forward and the constitutional rights of baby La'Mello may be vindicated.

Respectfully submitted,

Estate of La'Mello Parker and L.S.

By: */s/ Madeline M. Iles*
    Madeline M. Iles
    Attorney for the Appellants

J. Matthew Eichelberger, Miss. Bar No. 101060
Madeline M. Iles, Miss Bar No. 106186
The Eichelberger Law Firm
1640 Lelia Drive, Suite 120
Jackson, MS 39216
T: 601.292.7940
F: 601.510.9103
E: matt@ike-law.com
E: madeline@ike-law.com

# CERTIFICATE OF SERVICE

I, Madeline M. Iles, Counsel for the Plaintiff-Appellants, hereby certify that the foregoing document has been served via the Court's ECF system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, to all counsel of record, and has been transmitted to the Clerk of Court.

So certified, this the 6th day of November, 2024.

*/s/ Madeline Iles*
Madeline Iles

*Counsel for the Plaintiff-Appellants*

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,044 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 16 in Century font 14-point typeface.

So certified, this the 6th day of November, 2024.

*/s/ Madeline Iles*
Madeline Iles

*Counsel for the Plaintiff-Appellants*